# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN SERNOFFSKY, et al., | Case No. 23-cv-0039-MMA-VET |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MATT NOVAK, et al., | [Doc. No. 52] |
| Defendants. | |

Plaintiffs Susan Sernoffsky, Lauren Gaw, and Danielle Richardson (collectively, "Plaintiffs") bring this civil rights action pursuant to 42 U.S.C. § 1983 against San Diego Police Captain Matt Novak, San Diego Police Lieutenants Rick Aguilar and Jason Scott, and Does 1 through 15.  Doc. No. 1 ("Compl.").  On July 12, 2024, Defendants Novak, Aguilar, and Scott (collectively, "Defendants") filed a motion for summary judgment.  Doc. No. 52.  Plaintiffs filed a response in opposition, to which Defendants replied.  Doc. Nos. 53, 57.  The Court found the motion suitable for disposition on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.  Doc. No. 58.  For the reasons set forth below, the Court **GRANTS** Defendants' motion.

# I. Background[1]

This action arises from the protests in Pacific Beach on January 9, 2021. Doc. No. 53-1 ("Defendants' Separate Statement" or "DSS") No. 1. Days before the protests, the San Diego Police Department ("SDPD") became aware that a "Patriot March" was planned for 2:00 p.m. on January 9, 2021. DSS No. 2.[2] The group planned to march along the boardwalk from Thomas Avenue to Belmont Park. *Id.* SDPD also became aware that another group was planning a counter-protest to the Patriot March. DSS No. 3.

As anticipated, two groups of individuals participated in the protests on January 9, 2021: the individuals participating in the Patriot March; and a group of counter-protesters.[3] DSS No. 5. Defendant Novak was the SDPD Incident Commander working that day and Defendants Aguilar and Scott served as Operations Lieutenants under Defendant Novak. DSS No. 1. According to Defendants, SDPD's intent was to monitor both crowds and keep the opposing groups separate to prevent a large-scale violent interaction. DSS Nos. 5, 9.

By approximately 12:30 p.m., a group of counter-protesters had moved to the boardwalk near Crystal Pier.[4] DSS No. 6. Shortly after the counter-protesters began moving south on the boardwalk from Crystal Pier, at approximately 12:55 p.m., SDPD

---

[1] These material facts are taken from Defendants' separate statement of undisputed material facts and Plaintiffs' responses thereto, as well as the parties' supporting declarations and exhibits. Disputed material facts are discussed in further detail where relevant to the Court's analysis. Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

[2] In response to Defendants' Separate Statement, Plaintiffs fail to meaningfully respond to several of Defendants' asserted undisputed facts. *See, e.g.*, DSS Nos. 1–2, 5–9, 12–13. Instead, Plaintiffs merely respond with evidentiary objections. *Id.* To the extent Plaintiffs fail to dispute a fact or purport to dispute a fact but fail to set forth a relevant basis for doing so, the Court treats the fact as undisputed.

[3] The parties have invariably referred to these two groups using different, sometimes derogatory, monikers and descriptions. For the sake of clarity, the Court refers to the two groups as the "protesters" and "counter-protesters."

[4] The Court takes judicial notice of the fact that Crystal Pier is located along the Pacific Beach boardwalk near the intersection of Mission Boulevard and Garnet Avenue.

received a report that "subjects in Antifa[5] gear are chasing subjects wearing Trump[6] gear." DSS No. 7. Between 1:20 and 1:25 p.m., several reports were made to SDPD that people were physically fighting with baseball bats and pepper spray. DSS No. 7. Additionally, citizen reports indicated that individuals dressed in "Antifa gear" and carrying baseball bats were chasing individuals wearing Trump gear. DSS No. 8. These reports described these individuals as dressed entirely in black, wearing ski masks and Kevlar vests, as well as a subject yelling and pursuing others. *Id.* SDPD also received reports of subjects wearing black helmets and black military gear, subjects getting verbally aggressive, and subjects getting pepper sprayed by other subjects. DSS No. 9. Video footage confirms these reports as well as depicting this crowd moving north along the Pacific Beach boardwalk, eventually turning right on Garnet Street and then turning right again, heading southbound on Mission Boulevard. Def. Exs.[7] 9-1–9-11.

Eventually, the two groups reached the same location at the intersection of Mission Boulevard and Hornblend Street: the protesters in the area of 4400–4450 Mission Boulevard and the counter-protesters in the area of 4450–4500 Mission Boulevard. DSS No. 11. SDPD's Northern Division's Mobile Field Force ("MFF") established lines of officers to separate the two groups with the protesters to the south and counter-protesters to the north (the "Buffer Zone"). DSS Nos. 10–11. Captain Novak was stationed in the Buffer Zone. DSS No. 11.

By approximately 2:20 p.m., the counter-protesters in the street at 4400 Mission Boulevard had taken over all lanes of traffic. DSS No. 14. There were an estimated 100 to 150 counter-protesters at this time. DSS No. 17.

---

[5] The Court notes that "Antifa" references are to the anti-fascist political movement. DSS No. 3.
[6] The record duly reflects, and it is undisputed, that the protest group was associated with wearing "Trump gear" or being "pro-Trump." *See*, *e.g.*, DSS No. 1.
[7] The Court hereinafter cites to Defendants' exhibits appended to the declaration of Laura K. Gatney, Doc. Nos. 52-6–52-16, as "Def. Ex." Additionally, all citations to "Pl. Ex." refer to Plaintiffs' exhibits submitted along with their opposition, Doc. No. 56." And except where otherwise noted, all citations refer to the pagination assigned by the CM/ECF system.

1   At 2:25 p.m., an officer over the SDPD radio reported that an unlawful assembly

2   order will be issued "in a few minutes," noting "we're taking bottles and eggs." DSS

3   No. 16; Def. Ex. 9-14 at 14:25.[8]  One minute later, an officer over the SDPD radio

4   reported a man being assaulted on Mission Boulevard and that someone in the crowd had

5   a taser.  Def. Ex. 9-16 at 14:26.

6   At 2:26 p.m., SDPD received a report that a male in the crowd on the counter-

7   protester side was carrying a long knife in a sheath.  Def. Ex. 9-17 at 14:26.

8   Between approximately 2:30 p.m. and 2:35 p.m., Captain Novak requested that

9   additional response teams deploy to the Buffer Zone and he reiterated that an unlawful

10  assembly order was going to be issued.  *See* DSS No. 17; Def. Exs. 9-20 at 14:31, 9-22 at

11  14:34.

12  At 2:34 p.m., SDPD made an unlawful assembly declaration.  *See* Def. Ex. 9-22 at

13  14:34:24; Pl. Ex. 1 at 22:34:27.  The parties seemingly agree that the order was directed

14  at the north side of the Buffer Zone on Mission Boulevard, towards the counter-

15  protesters, and the declaration was made using a bullhorn and loudspeaker.  DSS

16  Nos. 17–18.

17  At approximately 2:36 p.m., Captain Novak stated that he made the declaration

18  early so that there would be no dispute it was made and that it was heard.  Def. Ex. 9-24

19  at 14:36:07.  Around the same time, counter-protesters moved north, away from the

20  Buffer Zone.  *See* Pl. Ex. 1 at 22:36:20.  Immediately thereafter, an SDPD officer over

21  the radio reported that police "took one rock."  Def. Ex. 9-23 at 14:36:30.

22  At 2:38 p.m., after the counter-protesters moved away from the Buffer Zone, a

23  motorcyclist arrived and drove in circles between the counter-protesters and the Buffer

24  Zone.  *See* Def. Ex. 11-1 at 22:38:00–22:41:07.  Around this same time, a line of police

25

26

27  [8] All citations to the parties' video evidence include a pinpoint citation to the time stamp as shown on the videos.  However, the Court notes that time stamps beginning with 22 or 23 are in Universal Time, which was 8 hours ahead of the Pacific Time Zone on January 9, 2021.  Doc. No. 52-15 at 3 fn.1.  For example, UTC 22:38 is PST 14:38, etc.

28

officers began moving northbound on Mission Boulevard, and fireworks were set off from within the counter-protesters crowd.  *See* Def. Ex. 11-1 at 22:40:46 (police line moving north), 22:41:20 (fireworks); Def. Ex. 12-2 at 22:40:20 (officer stating there are fireworks).  Then at 2:39 p.m., a counter-protester asked an officer in the Buffer Zone if the protesters were also leaving, to which the officer responded: "Yes, this whole area ma'am."  Doc. No. 53-4 ("Lien Decl.") ¶ 14; *see also* Pl. Ex. 2.  Beginning at approximately 2:45 p.m., and throughout the remainder of the encounter, counter-protesters threw objects such as eggs, glass, and plastic bottles, at SDPD officers.  DSS No. 14; *see also* Def. Ex. 13 at 22:44:08; Def. Ex. 14 at 23:19:34; Def. Ex. 17 at 23:20:14; Def. Ex. 19 at 23:32:39; Def. Ex. 20-2 at 22:59:38; Def. Ex. 20-5 at 23:18:16. At least one additional unlawful assembly declaration was announced during this time. DSS Nos. 19, 20; Def. Ex. 20-3 at 23:11:10 (part of another announcement from SDPD stating that the counter-protesters will be arrested if they do not leave the area); Doc. No. 52-4 ("Eglin Decl.") ¶¶ 12 ("An SDPD officer announced to the crowd that an unlawful assembly had been declared and ordered the group to disperse a second time."), 13 ("Approximately nine minutes elapsed between the initial order to disperse and the second dispersal order.").

At approximately 3:19 p.m., a man emerged from what appears to be an alley off of Mission Boulevard, approached the group of counter-protesters, and shoved a counter-protester who was writing on the ground with chalk.  *See* Def. Ex. 14 at 23:19:21; Def. Ex. 15 at 23:19:13; Def. Ex. 16 at 23:19:19.  As the counter-protesters began confronting this man, the police moved forward and let him pass through the Buffer Zone.  Def. Ex. 15 at 23:19:13.

Shortly after, at or around 3:32 p.m., the police line again moved northbound towards the counter-protesters.  *See* Def. Ex. 20-9 at 23:32:16; Def. Ex. 20-10 at 23:32:23; Def. Ex. 18-2 at 23:32:15; Def. Ex. 19 at 23:32:53.  During this time, a police officer attempted to arrest a counter-protester but other counter-protesters "de-arrested" the individual.  DSS No. 21; Def. Ex. 18-2 at 23:32:54–23:33:33; Novak Decl. ¶ 22.

Around the time the police line advanced northbound, Plaintiff Richardson recalled the following:

> At one point, the line of riot police yelled "move!" and began another push forward, but I could not move back because there were people standing behind me. An officer shoved me with their baton and I fell down, hitting my head on the ground. The police line then moved over me, and another officer picked me up by my backpack and tossed me back on the other side of the police line (I am 4 foot 10 and petite).

Doc. No. 53-2 at ¶ 11 ("Richardson Decl."). Once the police line stopped moving northbound, SDPD Special Weapons and Tactics ("SWAT") officers stepped in front and began firing non-lethal pepper ball munitions at the ground several feet in front of the counter-protesters. Eglin Decl. ¶ 14; DSS Nos. 25, 26; Def. Ex. 18-2 at 23:33:40. Once pepper ball munitions were deployed, the counter-protest group dispersed. DSS No. 21; Doc. No. 52-3 ("Novak Decl.") ¶ 23; Eglin Decl. ¶ 31. Around the same time that the counter-protesters dispersed, the protesters marched to the boardwalk, through an alley, and ultimately dispersed from a CVS parking lot. DSS ¶ 22; Novak Decl. ¶ 23.

It is not meaningfully disputed that during the confrontation at the Buffer Zone, several SDPD officers were hit with items, such as rocks and bottles, that had been thrown at them from the counter-protester side of the Buffer Zone. DSS No. 23. It is also undisputed that at least eight individuals associated with Antifa were later charged with and convicted of various crimes in connection with their involvement in the counter-protest, including conspiracy to riot and use of tear gas. Def. Ex. 24; Def. Ex. 7.

## II. EVIDENTIARY OBJECTIONS

As an initial matter, both parties have lodged evidentiary objections to the other's evidence. DSS; Doc. Nos. 53-5, 53-6, 53-7; Doc. Nos. 57-1, 57-2, 57-3, 57-4. The Court begins with the general position that most, if not all, evidentiary objections are inappropriate at summary judgment. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*,

285 F.3d 764, 773 (9th Cir. 2002).  However, at the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial").  "Rule 56[(c)] requires only that evidence 'would be admissible,' not that it presently be admissible."  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).  Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form."  *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (first citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); and then citing *Fraser*, 342 F.3d at 1036).

For these reasons, objections such as lack of foundation, speculation, hearsay, relevance, or that evidence is argumentative or constitutes an improper legal conclusion "are all duplicative of the summary judgment standard itself" and unnecessary to consider here.  *Burch*, 433 F. Supp. 2d at 1119; *see also Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (collecting cases).  Moreover, Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues.  *See Montoya v. Orange Cnty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (stating that courts "need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of the issues, or any other grounds outlined in Rule 403").

With this in mind, the Court turns to the parties' objections.

**A.    Plaintiffs' Evidentiary Objections**

First, Plaintiffs raise evidentiary objections in response to Defendants' Separate Statement.  *See generally* DSS.  The Court **OVERRULES** these objections in their entirety.  First, these are boilerplate objections devoid of any specific analysis.  *See*

*Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development."). More importantly, a party's separate statement of undisputed material facts is not evidence, it is a tool designed to assist courts with determining whether the moving party has met their burden. At summary judgment, courts rely on the underlying evidence, not the statements contained within a separate statement of undisputed material facts, *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1084 (E.D. Cal. 2016) ("The court's decision relies on the evidence submitted rather than how that evidence is characterized in the statements."); *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1071 (C.D. Cal. 2015) (same), and so challenges should be directed at the evidence supporting those statements instead, *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) (citing *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008) (noting that the parties' "evidentiary objections to [their adversary's] separate statements of undisputed facts are not considered because such objections should be directed at the evidence supporting those statements")).

Next, Plaintiffs object to the declarations of Thomas Eglin, Captain Novak, and Laura Gatney. Beginning with Thomas Eglin, he is the City of San Diego's use of force expert, and he offers a declaration in support of Defendants' motion. *See* Eglin Decl. The Court **OVERRULES** Plaintiffs' general objection to Eglin's declaration as being unreliable and inadmissible under Federal Rule of Evidence 702 because he does not refute or acknowledge the photograph "screenshots" in the Complaint. Doc. No. 53 at 9. Plaintiffs do not properly challenge Eglin's expert opinion evidence and testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311 (9th Cir. 1995). In any event, having reviewed Eglin's declaration and qualifications, *see* Eglin Decl. at 17–23, the Court is satisfied that his use of force opinions are sufficiently reliable.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 4. Eglin's statement that he reviewed several videos and pieces of evidence prior to making his

declaration is neither vague nor ambiguous.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 5.  First, this objection is devoid of any analysis.  Moreover, as explained above, lack of foundation and hearsay objections are not appropriate at summary judgment.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 6.  This statement is neither vague nor ambiguous.  Eglin does not lack personal knowledge because he reviewed the video footage and, in any event, the focus is on the admissibility of the content, not the form, of this evidence.  Further, as explained above, lack of foundation and hearsay objections are not appropriate at summary judgment.  Finally, objections to the characterization, weight, or credibility of evidence, such as that Eglin "[m]isstates facts" or that his statement is "[v]ague and ambiguous" are not proper evidentiary objections to evidence put forth at summary judgment.  *Salter v. Wash. Twp. Health Care Dist.*, 260 F. Supp. 2d 919, 923–24 (N.D. Cal 2003), *rev'd in part on other grounds*, 112 F. App'x 557 (9th Cir. 2004) ("[W]hether a declaration, from the opposing party's view, misstates facts pertains to the weight and credibility to be afforded and is not a proper basis to exclude it from evidence.").  To that end, to the extent any declarant's summary of evidence elsewhere in the record is inconsistent with what is depicted in the video evidence itself, the Court notes that the facts must be viewed "in the light depicted by the videotape" and that the Court may not adopt a version of the facts that is blatantly contradicted by the record for the purpose of resolving summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 7.  First, this objection is devoid of any analysis.  Moreover, as explained above, objections that evidence "misstates facts," as well as lack of foundation and hearsay objections are not appropriate to this evidence and at summary judgment.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 8.  Plaintiffs' assertion that Eglin's statement misstates facts is not a proper summary judgment evidentiary objection.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 9. Lack of foundation, hearsay, and misstates facts are not proper evidentiary objections to this evidence and at summary judgment. Further, the Court finds that Eglin does not lack personal knowledge, as he reviewed the video footage and the content of this evidence can be admitted in some form at trial.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 10. Lack of foundation, hearsay, misstates facts, "vague as to time," and "conflates the timeline" are not appropriate evidentiary objections to this evidence and at this stage.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 13. Lack of foundation, hearsay, vague as to time, and misstates facts are not appropriate evidentiary objections to this evidence and at this stage.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 21. Lack of foundation, hearsay, and the assertion that Eglin misstates what is depicted in the video are not appropriate evidentiary objections to this evidence and at this stage.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 22. Plaintiffs' objection that Eglin lacks foundation and that he "fails to refer to any video or other evidence" are not appropriate evidentiary objections to this evidence and at the summary judgment stage.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 23. Lack of foundation, hearsay, and speculation are not proper evidentiary objections to this evidence and at summary judgment. Additionally, Plaintiffs do not explain what opinion contained within this paragraph is improper or why it is subject to exclusion.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 25. Plaintiffs' objection that Eglin lacks foundation and that his statement contains hearsay, "conflates the timeline," and is "vague as to time" are not proper evidentiary objections to this evidence and at the summary judgment stage.

The Court **OVERRULES** Plaintiffs' objection to Eglin Decl. ¶ 27. "Misstates facts" is not a proper evidentiary objection.

Next, Plaintiffs object to paragraphs contained within Defendant Novak's declaration.  *See* Doc. No. 52-3.

The Court **OVERRULES** Plaintiffs' boilerplate objection to Novak Decl. ¶ 6. Defendant Novak makes his declaration based upon personal knowledge and he was present at the protests on January 9, 2021.  Novak Decl. ¶¶ 1–2.  Therefore, he does not lack the foundation to testify to the contents of this paragraph.  Additionally, this paragraph does not contain hearsay, and regardless, hearsay is not a proper objection at this stage.  Further, Plaintiffs' objection to the characterization of this evidence as vague is not a proper evidentiary objection at this stage.

The Court **OVERRULES** Plaintiffs' boilerplate objection to Novak Decl. ¶ 7. Because Defendant Novak was present at the protests, he does not lack the foundation to testify to the contents of this paragraph.  Additionally, this paragraph contains no hearsay and, in any event, hearsay is not a proper objection because the Court finds that the content of this evidence can be offered in admissible form at trial.  Further, Plaintiffs' objections to the characterization of this evidence as vague and ambiguous are not appropriate at this stage.

The Court **OVERRULES** Plaintiffs' boilerplate objection to Novak Decl. ¶ 8. Defendant Novak makes his declaration based upon personal knowledge and he was present at the protests on January 9, 2021.  Novak Decl. ¶¶ 1–2.  Therefore, he does not lack the foundation to testify to the contents of this paragraph.  Additionally, this paragraph contains no hearsay and, in any event, hearsay is not a proper objection at the summary judgment stage.  Further, Plaintiffs' objections to the characterization of this evidence as vague and ambiguous are inappropriate at this stage.

The Court **OVERRULES** Plaintiffs' objection to Novak Decl. ¶ 11.  Defendant Novak makes his declaration based upon personal knowledge and he was present at the protests on January 9, 2021.  Novak Decl. ¶¶ 1–2.  Therefore, he does not lack the foundation to testify to the contents of this paragraph.  Additionally, this paragraph contains no hearsay and, in any event, hearsay is not a proper objection at this stage.

Moreover, Plaintiffs' objections to the characterization of this evidence as vague and ambiguous are inappropriate.

The Court **OVERRULES** Plaintiffs' objection to Novak Decl. ¶ 12.  Defendant Novak makes his declaration based upon personal knowledge and he was present at the protests on January 9, 2021.  Novak Decl. ¶¶ 1–2.  Therefore, he does not lack the foundation to testify to the contents of this paragraph.  Additionally, objections to the characterization of this evidence as vague or inconsistent with evidence elsewhere in the record are inappropriate.

The Court **OVERRULES** Plaintiffs' boilerplate objection to Novak Decl. ¶ 13.  "Misstates facts" is not a proper evidentiary objection at summary judgment.

The Court **OVERRULES** Plaintiffs' boilerplate objections to Novak Decl. ¶¶ 15–17.  Plaintiffs' characterization of this evidence as vague or misstating facts elsewhere in the record are not proper evidentiary objections at summary judgment.

The Court **OVERRULES** Plaintiffs' objections to Novak Decl. ¶¶ 18–19.  Plaintiffs' objections to the characterization of this evidence are not proper evidentiary objections.

The Court **OVERRULES** Plaintiffs' boilerplate objections to Novak Decl. ¶¶ 20 and 22.  Lack of foundation, hearsay, and that a statement is vague are not proper evidentiary objections to this summary judgment evidence.

The Court **OVERRULES** Plaintiffs' objection to Novak Decl. ¶ 24.  Plaintiffs' characterization that this evidence misstates facts is not a proper evidentiary objection at summary judgment.

The Court **OVERRULES** Plaintiffs' objections to Novak Decl. ¶¶ 25 and 26.  Lack of foundation, hearsay, and that a statement is vague, "conflates the timeline and cause and effect," and misstates facts are not proper evidentiary objections to this evidence and at the summary judgment stage.

Finally, Plaintiffs object to various paragraphs within the declaration of Laura K. Gatney.  *See* Doc. No. 53-6.  The Court categorically **OVERRULES** all of Plaintiffs'

objections.  Ms. Gatney is a Deputy City Attorney and attorney of record for Defendants in this matter.  Doc. No. 52-5 ("Gatney Decl.") ¶ 1.  She makes her declaration based upon her familiarity with the facts, allegations, and proceedings in this case.  *Id.*  By way of her declaration, she only seeks to offer 24 exhibits in support of Defendants' motion for summary judgment.

It is well-understood that attorneys can offer declarations in support of summary judgment filings where they set forth matters of which the attorney has knowledge, such as the authenticity of deposition transcripts or other evidence produced during discovery. *Clark v. Cnty. of Tulare*, 755 F. Supp. 2d 1075, 1084 (E.D. Cal. 2010).  Moreover,

> Because attorneys, as officers of the court, are presumed not to offer in opposition to summary judgment evidence that they have no good faith basis to believe will be available or admissible at trial, the burden is on the moving party to demonstrate that facially adequate affidavits that comply with Rule 56(e) should not be considered valid evidence.

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 131 (2d Cir. 2004).

And here, Plaintiffs do not genuinely dispute the authenticity of the exhibits Ms. Gatney offers.  For that reason, Plaintiffs' lack of foundation objections fail. Additionally, as noted above, hearsay is not an appropriate objection at summary judgment.  Further, Federal Rule of Evidence 106 states, in full: "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection."  Fed. R. Evid. 106. This rule has no apparent relevance to evidence offered at summary judgment and does not command that a statement be excluded.  Instead, Federal Rule of Evidence 106 contemplates an adverse party's ability to further introduce parts of a challenged statement as the cure available for that statement's admission.  *Id.*  Plaintiffs had the opportunity to submit their own evidence in opposition to Defendants' motion for summary judgment.  Thus, employing it to exclude evidence at summary judgment,

nevertheless a declaration offered by counsel of record for the opposing party, is not appropriate.

Additionally, Plaintiffs repeatedly cite to Federal Rule of Evidence 403. Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues; Federal Rule of Evidence 403 considers the exclusion of evidence where its probative value is outweighed by dangers that are only relevant in the setting of a jury trial. *See Montoya*, 987 F. Supp. 2d at 994 (stating that courts "need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of the issues, or any other grounds outlined in Rule 403").

For all of these reasons, the Court need not parse through each of Plaintiffs' objections to the Gatney Declaration and simply **OVERRULES** all of them.

## B. Defendants' Evidentiary Objections

Turning to Defendants' objections, Defendants first object to the declaration of Mandy Lien. Doc. No. 57-1. Ms. Lien was a plaintiff in the related case of *Lien v. City of San Diego*, Case No. 21-cv-0224-MMA-WVG. She offers her declaration in this case in opposition to Defendants' summary judgment motion, which she made based upon personal knowledge as she was present at the January 9, 2021 protests. Lien Decl ¶¶ 1–2.

The Court **SUSTAINS** Defendants' objection to Lien Decl. ¶ 4. Ms. Lien does not explain how she has the personal knowledge to testify to the fact that "[t]he City has been unable to identify any evidence of even a single incidence of violence or unlawful activity being committed by [the counter-]protesters on my uninterrupted bodycam footage prior to SDPD declaring an 'unlawful assembly' on only the [counter-protester] side."

The Court **SUSTAINS** Defendants' objection to Lien Decl. ¶ 7. Although Ms. Lien may have past experiences with SDPD at protests, she cannot testify to the "purpose" of SDPD's strategy of lining its officers as she is neither an expert nor does she have personal knowledge of this purported fact.

The Court **OVERRULES** Defendants' objection to Lien Decl. ¶ 8. Ms. Lien does not lack the foundation to testify to the contents of this paragraph as she was present at the January 9, 2021 protests.

The Court **OVERRULES** Defendants' objections to Lien Decl. ¶¶ 9, 10, 12, 13, 14, 17, 19, 22, and 23. Listing four boilerplate objections to nine separate paragraphs is inadequate. Further, as Ms. Lien was present at the protests, she has personal knowledge to testify to her experiences and layperson opinions. Additionally, Defendants' objections to the characterization of this evidence, such as that Ms. Lien misstates the evidence or speculates, are not appropriate evidentiary objections. That said, the Court notes that Ms. Lien cannot testify to or speak on behalf of "we"—presumably, the counter-protesters. *See, e.g.*, Lien Decl. ¶¶ 9 ("We hoped the police would then . . ."), 10 ("[W]e wanted to make sure our message against hate was heard too . . .").

The Court **SUSTAINS** Defendants' objection to Lien Decl. ¶ 26. Clearly, Ms. Lien cannot testify to the purported fact that Defendants intended to deprive her and others of their constitutional rights. This statement is an improper legal conclusion and not based upon personal knowledge. *See* Fed. R. Evid. 602, 701.

Next, Defendants object to Plaintiff Sernoffsky's declaration. Doc. No. 57-2; *see also* Doc. No. 53-3 ("Sernoffsky Decl."). The Court **SUSTAINS IN PART** Defendants' objection to Sernoffsky Decl. ¶¶ 2, 3. Sernoffsky was present at the January 9, 2021 protests and therefore has personal knowledge to testify to the facts contained within these paragraphs. Moreover, Defendants' objection to the characterization of this evidence as being speculative is not an appropriate evidentiary objection and Sernoffsky's statements largely do not contain improper opinion. However, Sernoffsky lacks the personal knowledge or qualifications to testify to the purported fact that SDPD showed an "obvious bias" at the protests. Lien Decl. ¶ 3. To that limited extent, the Court **SUSTAINS** Defendants' objection.

Finally, Defendants object to the declaration of Plaintiff Richardson. Doc. No. 57-3. The Court **OVERRULES** Defendants' objections to Richardson Decl. ¶¶ 3, 5–10, 13–

14.  Richardson was present at the January 9, 2021 protests and therefore has personal knowledge to testify to the facts in these paragraphs.  Additionally, the Court finds that her statements do not contain improper opinions.  Further, Defendants' objections to the characterization of this evidence as being speculative, as well as the assertion that Richardson misstates facts, are not appropriate evidentiary objections at the summary judgment stage.

### III. L<sub>EGAL</sub> S<sub>TANDARD</sub>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the "outcome of the suit" under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the jury could

reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). That said, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 256.

Rule 56 mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

## IV. DISCUSSION

Defendants move for summary judgment in their favor on all of Plaintiffs' claims, arguing that Plaintiffs' constitutional rights were not violated and that Defendants are entitled to qualified immunity. *See generally* Doc. No. 52. Plaintiffs disagree.[9] As a threshold matter, the Court addresses Plaintiffs' pleading of their claims. Plaintiffs plead two causes of action: (1) violation of their First, Fourth, and Fourteenth Amendment rights; and (2) "Violation of 42 U.S.C. § 1983 (Supervisory Liability)." Doc. No. 1 ("Compl.") at 47–49. They name as defendants SDPD Captain Novak, SDPD Lieutenant Aguilar, SDPD Lieutenant Scott, and Does 1–15. *Id.* at 1. Plaintiffs fail to specify which claims they bring against which Defendants, or if they bring both claims against all Defendants.[10]

Title 42 of the United States Code, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere

---

[9] Plaintiffs have devoted a mere five pages of their opposition brief to their arguments against summary judgment. *See* Doc. No. 53 at 18–22. The remainder of their brief is almost entirely devoted to disputing Eglin's and Novak's narrative of the events depicted in the video evidence. *Id.* at 7–17.

[10] Because discovery has closed and Plaintiffs have not identified any individuals they initially named as Does in this action, the Court **DISMISSES** Plaintiffs' claims against Does 1–15 without prejudice.

conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks and citation omitted). Thus, "Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). Consequently, there is no such claim for "Violation of 42 U.S.C. § 1983." Compl. at 47–48. It appears to the Court that Plaintiffs seek to press three separate claims for violations of their First, Fourth, and Fourteenth Amendment rights against Defendants as individuals pursuant to 42 U.S.C. § 1983. It is not entirely clear, but the Court assumes based upon Plaintiffs' pleading that they seek to hold Defendants liable either based upon their individual participation in the events in question or based upon a theory of supervisor liability.

"To establish § 1983 liability, a plaintiff must show both (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012). Here, Defendants do not dispute that they were acting under color of state law during the events in question. Doc. No. 52-1 at 28. Therefore, the Court turns to whether Plaintiffs have put forth sufficient evidence to create a triable issue of fact as to whether their constitutional rights were violated and, if so, whether Defendants are nevertheless entitled to qualified immunity.

## A.    First Amendment Claim

First, Plaintiffs contend that Defendants violated their First Amendment rights. Doc. No. 1 at 47. The First Amendment protects, among other things, "freedom of speech" and "the right of the people peaceably to assemble." U.S. CONST. amend. I. It is well established that this includes activities such as demonstrations and protest marches. *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (citing *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). With respect to First Amendment activities in public spaces, the government may only impose reasonable content-neutral restrictions on the time, place, and manner of protected speech taking place in public forums. *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995).

It is not in dispute that on January 9, 2021, Plaintiffs were engaged in the protected activity of counter-protesting. *See* Richardson Decl. ¶ 2; *see generally* Sernoffsky Decl. It is also undisputed that at approximately 2:34 p.m., Captain Novak ordered that an unlawful assembly declaration be made pursuant to California Penal Code § 407, and that the order was declared only towards the crowd on the north side of SDPD's Buffer Zone on Mission Boulevard, which was where, generally speaking, the counter-protesters had congregated. DSS No. 17; Novak Decl. ¶ 18. Moving for summary judgment, Defendants first argue that the unlawful assembly declaration was valid. Doc. No. 52-1 at 17–19. Plaintiffs oppose, arguing that "[t]he actions taken by Defendants were content-based and directed at the [counter-protest] side because of their message, not because of anything they were doing." Doc. No. 53 at 20.

Relevant here, the California Penal Code places a restriction on the right to assemble by making it unlawful "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, . . . ." Cal. Penal Code § 407 (defining "unlawful assembly); *id.* § 408 (making it a misdemeanor to participate in an unlawful assembly); *id.* § 409 (making it a misdemeanor to remain present at the place of an unlawful assembly after being lawfully warned to disperse). In accordance with the requirements of the First Amendment, the California Supreme Court has narrowed the meaning of this unlawful assembly statute to include only those assemblies "which are violent or which pose a clear and present danger of imminent violence." *In re Brown*, 108 Cal. Rptr. 465, 472 (Cal. 1973). Consequently, the First Amendment does not prohibit dispersing protests or assemblies pursuant to California's unlawful assembly statute if "they are violent or pose a clear and present danger of imminent violence or are they are violating some other law in the process." *Collins*, 110 F.3d at 1371 (internal citations and quotation marks omitted) (cleaned up).

> Whether a particular situation presents a clear and present danger of imminent lawlessness must be evaluated under an objective standard, rather than based on the subjective apprehensions of the officers. *Johnson v. Perry*, 859 F.3d

156, 171 (2d Cir. 2017) (stating that "[f]ear of serious injury cannot alone justify suppression of free speech and assembly" and that "there must be reasonable ground to fear that serious evil will result" (emphasis omitted) (citation omitted)). Moreover, in assessing whether a sufficient clear and present danger justifies dispersal of a crowd, "[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120, 184 U.S. App. D.C. 215 (D.C. Cir. 1977) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)). Accordingly, the question here is whether the conduct of the persons in the Free Speech Zone, taken as a whole, created objectively reasonable grounds to conclude that there was a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); *see also Grayned*, 408 U.S. at 116 ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

*Puente v. City of Phoenix.*, 123 F.4th 1035, 1062 (9th Cir. 2024).

Here, the Court finds that Defendants have put forth evidence that individuals within the counter-protest crowd had turned violent, continued to pose a clear and present danger of violence, and that the counter-protest crowd as a whole had become substantially infected with violence prior to the unlawful assembly declaration. The undisputed record reflects the following events.

At 12:55 p.m., SDPD received several reports of groups in conflict at Crystal Pier, including that there were approximately 12 subjects with baseball bats walking southbound on Ocean Boulevard en route to Crystal Pier and that subjects in Antifa gear and/or wearing all black, including black ski masks and Kevlar vests, were chasing subjects wearing Trump gear. Def. Ex. 3 at 3; Eglin Decl. ¶ 5.

At 1:18 p.m., a caller reported approximately 50 people fighting using baseball bats and pepper spray. Def. Ex. 3 at 4; Eglin Decl. ¶ 5. The caller further explained "ANTIFA IS ASSAULTING LOTS" of people near the Christmas tree at the Pacific Beach pier. Def. Ex. 3 at 5; Eglin Decl. ¶ 5.

At 1:23 p.m. a caller reported that at least 20 subjects armed with batons were gathered at Crystal Pier and that by 1:25 p.m., the caller was reporting that the crowd had grown to approximately 50 to 100 subjects and that the subjects, armed with batons and pepper spray and wearing helmets, were "BECOMING PHYSICAL." Def. Ex. 3 at 5; Eglin Decl. ¶ 5.

At 1:43 p.m., a caller reported that an individual had been pepper sprayed by a man wearing black clothes and a black helmet and that there had been a violent altercation. Def. Ex. 3 at 6 ("SOMEONE WHO WAS BEING BEATEN UP"); Eglin Decl. ¶ 5.

At 1:51 p.m., it was reported that a man wearing all black and a baseball helmet had a pipe "tucked away" and a minute later, that "BOTTLES WERE THROWN, PEPPER SPRAY DEPLOYED BY SUBJ IN CROWN [sic] WEARING ALL BLACK." Def. Ex. 3 at 7; Eglin Decl. ¶ 5. At that same time, ABLE footage recorded an individual in black armed with a yellow baseball bat. Def. Ex. 9-1 at 13:51:48.

Between 2:00 and 2:05 p.m., this crowd moved southbound along the boardwalk towards Hornblend Street. Def. Exs. 9-2, 9-3. At 2:06 p.m., an individual in the crowd threw a chair. Def. Ex. 9-4 at 14:06:57.

One minute later, at 2:07 p.m., a fight breaks out at the front of the crowd: it is reported that a group of at least five individuals assaulted a woman, and that the woman was "trying to get out of there." Def. Ex. 3 at 8; Def. Ex. 9-5 at 14:07:01; Eglin Decl. ¶ 5. An officer over the SDPD radio then states that "this crowd is getting out of control" and that "they're assaulting a few different people now." Def. Ex. 9-6 at 14:07:44.

At 2:08 p.m., a group in the crowd is reported chasing a couple of people eastbound on Hornblend Street towards Mission Boulevard, including two subjects chasing one man, and that a bottle was thrown. Def. Ex. 9-7 at 14:08:00.

The rest of the crowd eventually reaches the cul-de-sac along the boardwalk at the Hornblend Street intersection. Def. Ex. 9-8 at 14:09:36. Roughly five minutes later, they began moving northbound on the boardwalk towards Garnet Avenue. Def. Ex. 9-9 at 14:15:02. Once they reach Garnet Avenue, the crowd turns and moves eastbound

towards Mission Boulevard.  Def. Ex. 9-10 at 14:17:40.  Once at the Garnet Avenue and Mission Boulevard intersection, the crowd turns southbound on Mission Boulevard towards Hornblend Street.  Def. Ex. 9-11 at 14:21:02.  The crowd can be seen walking in the street, blocking both lanes of southbound traffic.  *Id.*  They eventually reach the Buffer Zone—the line of officers stationed on Mission Boulevard at the Hornblend Street intersection.  Def. Ex. 9-11 at 14:22:27; Def. Ex. 9-12 at 14:23:00.

At 2:24 p.m., a call for MFF activation to the Buffer Zone was made.  Def. Ex. 9-13 at 14:24:18.  At 2:25 p.m., SDPD noted that it "WILL BE DOING UNLAWFUL ASSEMBLY IN A FEW MINS" and all units were advised to turn on their body worn cameras ("BWC") as they were "TAKING BOTTLES AND EGGS."  Def. Ex. 3 at 10; Def. Ex. 9-14 at 14:25:23.

At approximately 2:26 p.m., it was reported that a male was being assaulted at 4500 Mission Boulevard and that "SOMEONE IN CROWD HAS TASER."  Def. Ex. 3 at 10.  It was also reported that a man in the crowd had a long knife in a sheath.  Def. Ex. 3 at 11; Def. Ex. 9-17 at 14:26:37.  At 2:27 p.m., the man with the knife was identified as being in a black hoodie and brown pants.  Def. Ex. 3 at 11; Def. Ex. 9-18 at 14:27:35.  At 2:31 p.m., it was reported that a man had been hit on the head with a skateboard.  Def. Ex. 3 at 12.  At that same time, a request for additional units to the Buffer Zone was made.  Def. Ex. 9-20 at 14:31:45.

At 2:34 p.m., it is reiterated on the SDPD radio that an unlawful assembly declaration will be issued.  Def. Ex. 3 at 13; Def. Ex. 9-22 at 14:34:17.  Around this same exact time, SDPD issued an unlawful assembly declaration.  Pl. Ex. 1 at 22:34:24.  At 2:36 p.m., an officer over the radio reports that police "took one rock."  Def. Ex. 9-23 at 14:36:31.  Immediately after the unlawful assembly declaration was issued, undercover officers confirm that the announcement was heard.  Def. Ex. 9-24 at 14:36:05.

Defendants confirm these incidents and reports based upon their recollection of events that day.  Novak explains in his declaration that numerous members within the counter-protest group "became violent with citizens in and about the boardwalk area."

Novak Decl. ¶ 6.  He further notes that prior to the unlawful assembly declaration, SDPD received calls reporting the following:

- Multiple reporting parties report groups in conflict at the Crystal Pier
- Approximately 15 subjects possibly enroute to Crystal Pier
- Subjects with baseball bats
- Subjects in Antifa gear are chasing subjects wearing Trump gear
- Subjects in all black, ski masks and Kevlar vests
- Subjects are yelling and chasing people around location
- Approximately 50 people physically fighting using baseball bats and pepper spray
- Reporting party says Antifa is assaulting lots of people at the Pacific Beach Pier by the large Christmas tree
- 29 subjects have gathered and are in confrontation at Crystal Pier, subjects are armed with batons
- Subjects are now at the intersection near Crystal Pier approximately 50-100 becoming physical
- Subjects have possible batons and pepper spray and also have helmets

Novak Decl. ¶ 7.  Then, "[a]s the counter protest group began moving southbound," Novak "was informed that innocent citizens were being assaulted."  Novak Decl. ¶ 8.  SDPD also received additional calls reporting the following:

- A small group of 12 walking northbound on boardwalk from Thomas Avenue
- 2 subjects pepper spraying a male with a dog
- Suspects wearing black helmet, black military gear
- Subject got verbally aggressive then suspects pepper sprayed him
- 2 males at location stating they were pepper sprayed at the Pier when helping someone who was being beaten up
- Attempting to help subjects rinse their eyes
- A fight just started just south of the Pier on the boardwalk
- Crowd of five just assaulted a female in a green shirt, blue pants
- Walking southbound on boardwalk, is trying to get away from a crowd that is assaulting a few different people.

Novak Decl. ¶ 11.

Novak further explains that after walking north to the intersection of the boardwalk and Garnet Avenue, this crowd then "walked eastbound to Mission Boulevard, then turned south [on Mission Boulevard] toward Hornblend Street, where the [protesters] had been gathering for [their] march." Novak Decl. ¶ 12.  At that point, SDPD established the Buffer Zone on Mission Boulevard, with one line of police oriented towards the north and the other to the south.  Novak Decl. ¶ 13.  At this time, according to Novak:

> 15.    The counter protest group was extremely agitated and aggressive with law enforcement. Conversely, the Patriot March group was communicative with law enforcement and not aggressive.
>
> 16.    The counter protest group began to throw eggs, rocks, and bottles (both plastic and glass) at SDPD MFF lines. The Patriot March group remained static and non-aggressive with law enforcement; members of the Patriot March group were shouting at the counter demonstrators over the MFF lines.
>
> 17.    People in the Patriot March group were yelling across the buffer zone at the antifa group but did not throw anything or commit any violent acts as far as I was aware. The counter protester group, however, used shields and skateboards and people up front to protect themselves and to block the officers' view of the crowd.
>
> 18.    Due to the counter protester group's increased agitation, aggression and violence, and the imminent threat of further violence, I requested additional MFF and munitions team deployment. A concern was that the counter protesters would continue their violent attacks against officers and engage in violent interactions with the Patriot March group. I also asked another officer to get my riot gear after rocks were thrown and hit the ground next to me. For the same reasons, and based on the totality of the circumstances, I gave the order for an unlawful assembly to be declared at approximately 2:34 p.m. The announcement and dispersal order were directed towards the counter protestor group because, as far as I was aware, it was the only group engaging in violence.

Novak Decl. ¶¶ 15–18.

Aguilar and Scott's recollections reflect the same.  According to Aguilar, by the time he reached the boardwalk at approximately 2:25 p.m., "he had already heard over

the radio that people had gotten pepper-sprayed and assaulted," including that a woman had been assaulted on the boardwalk and had been chased until she reached and was instructed to "go behind the line of officers from the bike team at Hornblend and Mission." Def. Ex. 4 at 3. Aguilar further confirmed the 2:25 p.m. report on the radio that police were "taking some bottles and eggs," explaining that this occurred "[a]t the intersection of Hornblend and Mission Boulevard. Bottles and eggs were being thrown from the north of Hornblend on Mission Boulevard, from the counter-protester side, to the south and towards officers." Def. Ex. 4 at 10; Def. Ex. 5 at 10 (Scott confirming the same); Def. Ex. 6 at 11 (Novak confirming the same). And with respect to his knowledge of specific violent or unlawful acts prior to the unlawful assembly declaration, Aguilar states:

> Defendant was aware that there had been multiple v[i]olent acts, including members of the public trying to use the boardwalk and sidewalk being harassed and assaulted. Defendant knew a male with a bat had been on the boardwalk; this was seen by the ABLE helicopter and undercover officers. Other individuals had been spraying others with an unknown substance and moved from the boardwalk to the north side of Mission Boulevard. Defendant was aware of these incidents because he heard them over the radio. It was difficult to identify specific individuals because they were wearing all black and had black masks, hats, hoodies, etc.

Def. Ex. 4 at 11; *see also id.* at 13; Def. Ex. 5 at 11 (Scott confirming the same).

As to Defendant Scott, when he was asked to identify the violent acts he witnessed prior to the unlawful assembly declaration, he stated the following:

> Defendant was at Belmont Park briefing a group of officers and tracking the timing of the Patriot March when he received a radio communication that appeared to reflect a citizen complaint about a person having been pepper-sprayed on the boardwalk. At about the same time, he additionally received a radio communication indicating that a group had attacked someone on the boardwalk.
> Shortly after, Defendant moved to the intersection of Hornblend and

Mission, where he personally witnessed persons on the north side of Mission Boulevard, who were part of the he counterprotest group, making vulgar verbalizations such as "Fuck the cops," "Fuck Trump," "ACAB," which stands for "All Cops Are Bastards," and "Quit your job." Additionally, Defendant personally observed a glass bottle coming from the middle of the counterprotest group, north of Hornblend, toward the officers; Defendant tried to catch this bottle to avoid it hitting any officers, but he was not able to get to the bottle fast enough, and the bottle missed hitting an officer by about three (3) feet and instead shattered when it hit the group. Defendant additionally personally observed eggs and rocks emanating from the counterprotest group toward the officers.

Def. Ex. 5 at 3.

Additionally, Defendants' use of force expert Mr. Eglin also confirms that the video footage reflects these calls and incidents. *See* Eglin Decl. ¶¶ 4–6.

Plaintiffs do not genuinely dispute that these violent acts took place. Richardson explains that she "arrived at the boardwalk a couple of hours before the protest was set to begin. I witnessed some altercations between pro- and anti-Trump individuals. Bike police advanced and separated the groups with their bikes. The individuals involved in the altercations then dispersed." Richardson Decl. ¶ 3. Richardson thus attempts to distance herself and her "side" from the counter-protesters involved in the violent altercations on the boardwalk. *See id.*; *id.* ¶ 5 ("Nothing is being thrown from our side, nor is anything violent happening on our side. This was in an entirely different area and hours later than the earlier altercations I had witnessed on the PB boardwalk. It also involved different people entirely."). But "[not every member of the assembly must individually commit unlawful acts to render the assembly unlawful." *In re Wagner*, 173 Cal. Rptr. 766, 771 (Cal. Ct. App. 1981). Additionally, the evidence, including the ABLE footage, confirms that the individuals who perpetrated these acts of violence immediately proceeded to congregate north of the Buffer Zone to counter-protest.[11]

---

[11] Richardson's contention that the altercations described above "involved different people entirely" than those who congregated north of the Buffer Zone, Richardson Decl. ¶ 5, is blatantly contradicted by the

Moreover, Richardson merely states that other altercations occurred on the boardwalk hours earlier.  Richardson Decl. ¶ 5.  So accepting Richardson's narrative, her evidence of altercations "involv[ing] differently people entirely" hours earlier does not undermine Defendants' evidence that individuals who congregated among the counter-protesters committed acts of violence shortly before the unlawful assembly declaration was issued.

To that end, it is not genuinely disputed that Antifa-affiliated individuals were present at and committed acts of violence during the January 9, 2021 protests. Summarizing the violence perpetrated by Antifa-affiliated individuals that day, the San Diego District Attorney's Office issued a release entitled "DA Charges Defendants Responsible for Violent Pacific Beach Incident," noting the following:

- "On at least eight separate occasions, approximately 15 to 20 members from the counter protesting group (Antifa-affiliated) broke off and surrounded perceived members of the Patriot March group and attacked them using impact weapons and mace."

- As of December 6, 2021, "there [were] 16 known victims," including minors.

- "At one point, a line of 20 to 25 counter protesting individuals advanced on a smaller group of four people from the Patriot March, yelling obscenities at them and screaming for them to run. One member of the group, who was dressed in black with their face covered, pulled out a can of pepper spray and sprayed it in their faces. The smaller group was attacked with chairs, sticks, glass bottles, full alcohol/beer cans and closed fists as they were chased down the boardwalk."

- "The Antifa-affiliated group surrounded several minors who they believed to be attending the Patriot March, sprayed them with mace and chased them up the boardwalk, shoving one of the minors to the ground. The minor was surrounded and beaten resulting in the minor victim being taken to the hospital to be treated for a concussion."

---

ABLE footage, which follows these individuals throughout this time from the boardwalk until they reached the north side of the Buffer Zone located on Mission Boulevard.  *See* Def. Exs. 9-9, 9-10, 9-11.

1
2

- "In addition to assaults on those participating in the Patriot March, there were collateral victims including a dog that was maced, a journalist attempting to take photos, a business that was vandalized, and assaults on police officers."

3
4
5
6
7

Def. Ex. 7 at 2–3. These incidents are largely corroborated by the evidence in the record described above, including the ABLE footage and SDPD call and event records that documented individuals committing acts of violence just prior to congregating north of the Buffer Zone within the counter-protest crowd.

8
9
10
11
12
13
14
15
16
17
18

Plaintiffs' evidence does not show otherwise. In support of their opposition, Plaintiffs submit merely two pieces of evidence[12] in addition to the declarations of Richardson, Sernoffsky, and Lien. The first is a roughly 16-minute BWC video from SDPD Officer Cairns, beginning at 2:23 p.m. Pl. Ex. 1 at 22:23:23. Even accepting Plaintiffs' characterization of this evidence as showing "[n]othing being thrown" at 2:25 p.m., Doc. No. 53 at 18, that one SDPD officer's BWC footage does not show objects being thrown is not evidence sufficient to draw a reasonable inference that *nothing* was thrown, especially in light of Defendants' evidence that police were "taking some bottles and eggs" during this confrontation. It also does not undermine the undisputed evidence that individuals in the counter-protester crowd had committed violent acts and had thrown items and objects just prior to reaching the Buffer Zone.

19
20
21

The second piece of evidence is a 30-second video-clip from Ms. Lien's personal BWC footage beginning at 2:39 p.m. *See* Pl. Ex. 2. Plaintiffs do not explain how this evidence raises a triable issue of fact as to their First Amendment claim. And because an

22
23
24
25
26
27
28

_____

[12] To the extent Plaintiffs wish to rely on their Complaint as evidence, *see* Doc. No. 53 at 6, the Court notes that Plaintiffs are not proceeding *pro se* and, in any event, the Complaint is not verified. *See, e.g.*, *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (explaining that where a plaintiff is *pro se*, courts must consider verified pleadings as evidence in opposition to summary judgment); *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (explaining that a party with counsel "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements"). It should also be well-understood that Plaintiffs must go beyond their own pleadings to carry their burden in opposing summary judgment. *See Celotex*, 477 U.S. at 324.

unlawful assembly declaration had already been made prior to the recording of this footage, it appears to the Court that this evidence has no bearing on the legality of the unlawful assembly declaration.

Plaintiffs also point to the fact that none of Defendants' BWC footage shows items being thrown at or over the Buffer Zone before the unlawful assembly declaration was made. *See* Doc. No. 53 at 13 ("The evidence is that the objects being thrown at officers was in response to the false unlawful assembly declaration at 2:34 p.m. and did not begin until the [counter-protesters] first tried coming back to the intersection peacefully when they saw the [protesters were] being allowed to remain there, and then were forced back by police in riot gear."), 17 ("Novak also refers to a specific incident that occurred an hour later involving some individuals holding skateboards and a couple objects being thrown, and deliberately conflates this with the earlier unlawful assembly declaration."), 18 ("Nothing was being thrown, and no commands were given, as seen in the video. The [counter-protesters] returned three minutes later because the [protesters were] being allowed to stay. Again, nothing was being thrown, and no commands had been given for anyone to leave. Then, at 2:34 p.m., inexplicably and without any lawful basis, Defendants gave the first 'unlawful assembly' announcement[.]").  But all three Defendants recall items being thrown prior to the declaration, and this is corroborated by the ABLE footage, which recorded officers in real time reporting that police were "taking bottles and eggs."  Def. Ex. 4 at 10 (Aguilar stating that "[b]ottles and eggs were being thrown from the north of Hornblend on Mission Boulevard" at approximately 14:25:20); Def. Ex. 5 at 10 (Scott confirming the same); Def. Ex. 6 at 11 (Novak confirming the same); Def. Ex. 9-14 at 14:25:23 ("[W]e'll be issuing an unlawful assembly in a few minutes. We're taking bottles and eggs.").  Either way, the absence of this evidence does not change the undisputed fact that the individuals who eventually congregated north of the Buffer Zone to counter-protest had previously committed acts of violence including with weapons such as bats and pepper spray.  Def. Ex. 9-2 at 14:01 (counter-protesters spraying pepper spray on boardwalk); Def. Ex. 9-4 at 14:06 (counter-protesters throwing

chair); Def. Ex. 9-5 at 14:07 (counter-protesters attacking people walking on boardwalk); Def. Ex. 9-6 at 14:07 ("[T]his crowd is getting out of control."); Def. Ex. 9-7 at 14:08 (counter-protesters chasing people from the boardwalk in the direction of Mission Boulevard); Def. Ex. 9-9 at 14:15 (counter-protesters walking northbound on the boardwalk towards Garnet Avenue); Def. Ex. 9-10 at 14:17 (counter-protesters arriving at Garnet Avenue); Def. Ex. 9-11 at 14:21 (counter-protesters walking on Garnet Avenue and then going southbound on Mission Boulevard towards the Buffer Zone); Def. Ex. 9-16 at 14:25 (man getting assaulted northside of the Buffer Zone on Mission boulevard) .

Of course, even where, as here, there is video evidence of the incident, the record must still be viewed in the light most favorable to the nonmoving party, so long as their account of the events is not "blatantly contradicted" by the video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott*, 550 U.S. at 378–79). It may very well be true that Plaintiffs themselves did not exhibit violence during the counter-protest. And their position that no items were thrown during the confrontation on Mission Boulevard before the unlawful assembly declaration, Doc. No. 53 at 13, 18, is not blatantly contradicted by the video evidence. But for these reasons discussed above, this evidence and argument does not raise a material dispute. And their contention that the counter-protest group as a whole was peaceful or nonviolent is belied by the video evidence. *See* Richardson Decl. ¶ 5 ("The anti-Trump side, which I was on, can be seen peacefully standing there facing the police and pro-Trump protesters."); *id.* ¶ 8 (explaining that around 2:25 p.m., "there is still nothing violent happening on our side"); Sernoffsky Decl. ¶ 2 (declaring that she was "outraged" by the fact that SDPD had forced only the counter-protesters to disperse "despite there having been no violence on the [counter-protest] side prior to Defendants declaring it an 'unlawful assembly'"); *see also* Doc. No. 53 at 18 (arguing that prior to the unlawful assembly declaration, the counter-protest group "had been completely peaceful").

As discussed above, three facts are both supported on this record and not in dispute. First, individuals, including those aligned with or wearing Antifa-associated

gear and memorabilia, were present at the protests in Pacific Beach on January 9, 2021. Second, these individuals committed numerous acts of violence prior to 2:34 p.m., the time of the unlawful assembly declaration. And third, these individuals congregated to the north of SDPD's Buffer Zone among the counter-protesters.

Regarding the validity of the unlawful assembly declaration, Defendants offer evidence from Eglin, who opines that the decision to declare an unlawful assembly was reasonable based upon the following, which he observed in the video and audio recordings of the event:

- Individuals assaulting others in the crowd with pepper spray
- Individuals taunting or challenging the opposing group to fight.
- Motorcyclists revving their engines and riding in close proximity to officers
- Individuals dressed in protective clothing
- Wearing backpacks in a non-traditional manner on their chest
- Carrying sticks or baseball bats
- Using Skateboards and signs as shields
- Throwing objects at police officers

Eglin Decl. ¶ 25. Eglin opines that "these facts would lead a similarly trained and experienced officer to conclude there were sufficient reasonable articulable facts to support an imminent threat of violence and would lead that officer to declare the gathering an unlawful assembly and order the crowd to disperse." Eglin Decl. ¶ 26. Plaintiffs offer no evidence to the contrary on this point.

In sum, the undisputed record reflects that a large crowd of counter-protesters had turned violent prior to the unlawful assembly declaration. Numerous individuals had been chased and assaulted by counter-protesters, who were armed with and in some instances utilized weapons such as bats, batons, knives, tasers, and pepper spray. Throughout this time, individuals within the counter-protest crowd were seen throwing items such as chairs, rocks, bottles, and eggs. These are objectively and undoubtedly violent and unlawful acts as contemplated by California Penal Code § 407. The crowd

then immediately proceeded to confront the protest, which it set out to counter-protest, at the intersection of Mission Boulevard and Hornblend Street.  Whether any counter-protesters threw items towards the protesters or police once they reached the Buffer Zone on Mission Boulevard is not a material issue of fact on this record because, as to the "tenor of the demonstration as a whole," the counter-protest group had not just exhibited violence but had been "substantially infected with violence" prior to the unlawful assembly declaration, *Puente*, 123 F.4th at 1062 (internal quotation marks and citation omitted), and under these circumstances it was objectively reasonable for Novak to believe there was a clear and present danger that this violence would continue.  Plaintiffs offer no evidence to the contrary that could lead a reasonably jury to conclude otherwise. Thus, because the counter-protest group had turned violent and continued to pose a clear and present danger of continued violence and unlawfulness, it lost its First Amendment protections.  *See Grayned v. City of Rockford*, 408 U.S. 104, 116, (1972).  Consequently, the Court finds that the unlawful assembly declaration was valid and at that point, Plaintiffs had no First Amendment right to peaceably assemble or remain in the area of the unlawful assembly.

Regarding Plaintiffs' contention that the decision to declare an unlawful assembly only at the counter-protest group (or generally, the north side of the Buffer Zone) constitutes viewpoint discrimination, *see* Doc. No. 53 at 20, the Court notes that Plaintiffs have put forth no evidence than any protesters or individuals south of the Buffer Zone committed violence or other unlawful acts, or that they otherwise posed a serious, objective threat of danger or violence.[13]  On the other hand, Defendants have put forth

---

[13] Plaintiffs argue otherwise, for example, that Defendants' BWC videos show protesters "throwing a smoke bomb at the [counter-protesters]."  Doc. No. 53 at 17.  However, "arguments in briefs are not evidence," *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015), and there is no evidence of this or any violence committed by individuals on the south side of the Buffer Zone in the summary judgment record.  The Court further reiterates that Plaintiffs may not rely on their Complaint as evidence given that they are not proceeding *pro se* and the Complaint remains unverified.  *See, e.g.*, *Jones*, 393 F.3d at 923; *Hernandez*, 343 F.3d at 1112.

evidence that the protest group to the south of the Buffer Zone was not exhibiting violence.  Novak Decl. ¶ 17.  And this is supported by Sernoffsky herself, who recalls that the protesters were "engaged in friendly banter" with the officers in the Buffer Zone.  Sernoffsky Decl. ¶ 3.  Moreover, there is at least some evidence in the record that protesters were also present to the north of the Buffer Zone.  *See* Def. Ex. 9-16 at 14:25:55 (group of people assaulting man on Mission Boulevard, just north of the Buffer Zone); Def. Ex. 15 at 23:19:10 (man from the sidewalk shoves a counter-protester, further escalating tensions in the crowd); Def. Ex. 20-1 at 22:59:15 (counter-protester crowd engages in some sort of scuffle); Def. Ex. 20-5 at 23:17:38 (person on megaphone tells other counter-protesters to watch the alleys as people start yelling "watch out," while elsewhere, someone swings a baseball bat like a golf club and strikes a soda can towards Buffer Zone).  Therefore, there is simply no evidence in the record for a reasonable jury to conclude that the unlawful assembly declaration and subsequent dispersal of all individuals to the north of the Buffer Zone constituted viewpoint discrimination, especially where this side included both protesters and counter-protesters.

And more specifically, with respect to the decision to declare only the north side of the Buffer Zone an unlawful assembly, as one district court in this Circuit has noted, "[s]ome courts, including *Collins*, have suggested the First Amendment does not support unlawful assembly declarations based on violence, or a threat of violence, which occur amongst a few individuals in or around an otherwise peaceful assembly." *Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1095–96 (S.D. Cal. 2022), *aff'd* 2023 U.S. App. LEXIS 29751, at *3 (9th Cir. Nov. 8, 2023) (collecting cases).  Thus where, as here, two separate groups are separated by a police buffer zone, only one of which is exhibiting (or has been substantially infected with) violence, the Court notes that it may not be constitutionally sound to declare both sides an unlawful assembly.  *See* Eglin Decl. ¶ 27 (opining that "it would not have been appropriate to give an order to disperse directed at the group of individuals to the south of the police line" because they "did not appear to exhibit behavior that would lead an objectively reasonable officer to believe there was an

1   imminent threat of violence"). Consequently, the Court concludes that Plaintiffs have

2   failed to raise a triable issue of fact sufficient to overcome summary judgment and, on

3   this record, no reasonable jury could find that the decision to declare the north side of the

4   Buffer Zone an unlawful assembly was "because of" the counter-protest message.

5       At bottom, besides bare conclusory allegations, Plaintiffs offer nothing that creates

6   a genuine dispute for trial on the issue of whether deterrence or chilling of First

7   Amendment activity was a substantial and motivating factor behind Defendants' conduct.

8   Namely, they have failed to put forth evidence raising a triable dispute as to whether the

9   unlawful assembly order was valid or if it was directed at them because of their counter-

10  protest message. As such, the Court **GRANTS** Defendants' motion for summary

11  judgment as to Plaintiffs' First Amendment claim.

12  **B.    Fourth Amendment**

13      Next, Plaintiffs press a Fourth Amendment claim on the basis that SDPD's

14  dispersal of the counter-protesters, including Plaintiffs, amounted to an unreasonable

15  seizure and that excessive force was used in accomplishing that seizure. Compl. ¶ 96

16  ("The individual Defendants also violated the First, Fourth, and Fourteenth Amendment

17  rights of Plaintiffs by impacting Plaintiffs with chemical weapons and batons, with the

18  intention of forcing Plaintiffs to leave a public forum where they were peacefully

19  assembling and protesting."); *id.* ¶ 98 ("Plaintiffs had . . . a Fourth Amendment right to

20  be free from unreasonable seizures, . . . ."); Doc. No. 53 at 21 ("Defendants concede there

21  was a seizure here but contend that it was reasonable due to the actions of others on the

22  [counter-protesters] who made the assembly 'unlawful.' However, Defendants have

23  conflated the times and locations of what was occurring and when in order to justify the

24  seizure.").

25      The Fourth Amendment protects against the unreasonable seizure of persons. U.S.

26  Const. amend. IV. "Even if a seizure is reasonable in a particular circumstance, *how* that

27  seizure is carried out must also be reasonable." *Estate of Strickland v. Nevada Cnty.*, 69

28  F.4th 614, 619 (9th Cir. 2023) (emphasis in original). "So the Fourth Amendment also

prohibits the use of excessive force. Our 'calculus of reasonableness' in these circumstances 'must embody allowance for the fact that police officers are often forced to make split-second judgments' and we do not apply the '20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 395).

### 1.    *Unreasonable Seizure*

Here, Defendants concede for the limited purpose of resolving their motion that a seizure occurred.[14]  Doc. No. 52-1 at 23.  Defendants argue that probable cause existed to seize Plaintiffs and that the use of pepper balls and batons was not objectively unreasonable.  *Id.* at 23–24.  In response, Plaintiffs appear to dispute the legality of the

---

[14] Since Defendants filed their motion, the Ninth Circuit rendered a decision in *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), which is now binding on this Court.  In *Puente*, the Ninth Circuit expressly considered whether the use of force, namely, the use of pepper balls, muzzle blasts, and pepper spray, to disperse a crowd of protesters where no individual plaintiff had been physically touched but merely had been exposed to the chemical irritants "that were objectively aimed at moving them out of the area" could amount to a seizure as a matter of law, in light of the Supreme Court's decision in *Torres v. Madrid*, which held that "[a] seizure requires the use of force *with intent to restrain*. *Id.* at 1051–53 (citing 592 U.S. 306, 317 (2021)).  The Ninth Circuit expressly found that because the plaintiffs "produced no evidence that the chemical deployments at issue here were undertaken with an objective intent to restrain, such as, for example, by targeting an immobilizing level of force at selected individuals" and the also did "not show that the deployments somehow resulted in any submission to the officers' show of force, which arguably would have constituted a seizure from a show of authority." *Id.* at 1053.  As a result, the Ninth Circuit concluded there was "no objective intent to restrain" and, therefore, "no seizure for Fourth Amendment purposes." *Id. Puentes* appears directly on point at least as it relates to the use of pepper ball munitions in this case.  Here, it is undisputed that the projectiles were deployed to disperse the crowd, there is no evidence or argument tending to show that Defendants had the objective intent to restrain Plaintiffs, and Plaintiffs do not claim they were hit with the pepper ball munitions.  Based upon these undisputed facts, then, it appears that to the extent Plaintiffs base their Fourth Amendment claim on the deployment of pepper ball munitions, the use of force here was not in connection with a seizure within the meaning of the Fourth Amendment and as such, that Plaintiffs' claim is subject to scrutiny under the Fourteenth Amendment "shocks-the-conscience test." *Id.* at 1054 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844, 854 (1998)).  There appears to be insufficient evidence in this record for a reasonable jury to conclude that the use of pepper ball munitions here shocks the conscience and as such, Defendants would be entitled to summary judgment on this alternative ground.

However, because *Puente* was not decided until after this matter was fully briefed, and because at least one Plaintiff contends she was physically touched by an SDPD officer's baton during the dispersal efforts, the Court proceeds to consider whether the use of force was reasonable under the Fourth Amendment, assuming Plaintiffs were seized and the force at issue was used in connection with effecting that seizure.

unlawful assembly order and therefore whether the seizure was lawful or justified.  Doc. No. 53 at 21 (arguing that "Defendants have conflated the times and locations of what was occurring and when in order to justify the seizure").  It is not apparent how Defendants have conflated or confused the timing of events as all of their BWC footage is timestamped.  Plaintiffs then summarily conclude that there is a dispute of material fact over whether Defendants actions were reasonable.  *Id.*

As noted above, California Penal Code § 407, as interpreted by the California Supreme Court, makes violent assemblies, or assemblies that pose a clear and present danger of imminent violence, unlawful.  Further, any person who remains present at the place of an unlawful assembly after a lawful warning to disperse is guilty of a misdemeanor.  Cal. Penal Code § 409.  For the reasons discussed above, the only reasonable interpretation of the evidence presented is that there was probable cause to believe Plaintiffs were violating California Penal Code § 409 by remaining at the site of an unlawful assembly.  Novak declared the group to the north of the Buffer Zone an unlawful assembly, and Plaintiffs do not claim or put forth any evidence that a dispersal order was not given; in fact, Plaintiffs confirm that they heard it.  Richardson Decl. ¶ 9; Sernoffsky Decl. ¶ 3.  Thus, because Plaintiffs were lawfully warned that they must disperse, there cannot be any dispute that Defendants had probable cause to disperse Plaintiffs for remaining at the site of the counter-protest, as they were in violation of California Penal Code § 409.  *In re Wagner*, 173 Cal. Rptr. at 771 ("If a person is a participant in a lawful assembly which becomes unlawful, he has an immediate duty upon learning of the unlawful conduct to disassociate himself from the group.").  Thus, to the extent Plaintiffs challenge the mere fact that they were forced to disperse, the Court finds that no reasonable jury could conclude on this record that this amounted to an unconstitutional seizure.  On this basis, the Court **GRANTS** Defendants' motion.

### 2. *Excessive Force*

Defendants also argue that the use of pepper balls and batons was not objectively unreasonable.  Doc. No. 52-1 at 24–25.  A Fourth Amendment excessive force claim is

governed by the objective reasonableness standard, pursuant to which courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. To do so, courts consider several factors, including: "(1) the type and amount of force inflicted, (2) the severity of the crime at issue, (3) whether the suspect posed an immediate threat to the safety of the officers or others, and (4) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Strickland*, 69 F.4th at 619 (quoting *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (internal quotation marks omitted)). "But this list isn't exhaustive; [courts] may also consider other relevant factors, such as 'the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *Id.* (quoting *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)). "Of these, the 'immediate threat to safety' factor is the most important." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)).

Relevant to the use of force here, the following facts are not in dispute. At least two unlawful assembly orders were issued, at approximately 2:34 p.m. and 3:10 p.m., directing the crowd to disperse. *See* Def. Ex. 9-22 at 14:34:23 (asking dispatch to note time of first unlawful assembly declaration); Pl. Ex. 1 at 22:34:23 (BWC of first unlawful assembly declaration); Def. Ex. 20-3 at 23:11:10 (part of another announcement from SDPD stating that the counter-protesters will be arrested if they do not leave the area); Eglin Decl. ¶ 12 ("An SDPD officer announced to the crowd that an unlawful assembly had been declared and ordered the group to disperse a second time."); *id.* ¶ 13 ("Approximately nine minutes elapsed between the initial order to disperse and the second dispersal order."). Many individuals to the north of the Buffer Zone, including Plaintiffs, did not disperse as ordered; they moved north but did not leave the area. *See* Def. Exs. 11-1, 12-2, 13, 14, 15, 16, 17, 18-1, 18-2, 19, 20-1, 20-2, 20-3, 20-4, 20-5, 20-

6, 20-7, 20-8, 20-9, 20-10, 21-1, 21-2, 21-3, 22; Pl. Exs. 1, 2; Richardson Decl. ¶¶ 9–10; Sernoffsky Decl. ¶ 3; Eglin Decl. ¶ 10.  Richardson explicitly concedes that she only moved one block north before she "continued protesting in that area."  Richardson Decl. ¶¶ 9–10.  Instead, as Eglin describes, "the [counter-protesters] became increasingly boisterous and defiant."  Eglin Decl. ¶ 10.  For example, at 2:38 p.m. a motorcyclist can be seen driving in circles in the street up to the officers lined up in the Buffer Zone.  Def. Ex. 11-1 at 14:38:05; Def. Ex. 12-2 at 14:41:07; Def. Ex. 21-1 at 14:38:03.  At 2:41 p.m., police in the Buffer Zone noted that someone in the crowd set off fireworks.  Def. Ex. 12-2 at 14:41:23.  Thereafter, numerous items were thrown from the counter-protest crowd at police and/or the protesters, including glass bottles.  *See, e.g.*, Def. Ex. 13 at 22:44:08 (bottle); Def. Ex. 20-2 at 22:49:36 (eggs); Def. Ex. 20-5 at 23:18:15 (soda can); Def. Exs. 14 at 23:19:34, 15 at 23:19:34, 16 at 23:19:34 (glass bottle); Def. Ex. 17 at 23:20:15 (unidentified object hits officer); Def. Ex. 18-2 at 23:32:40 (bottle); Def. Ex. 19 at 23:32:38 (bottle); *see also* Eglin Decl. ¶¶ 11–12.  In one instance, an individual used a baseball bat to hit a can towards police in the Buffer Zone.  Eglin Decl. ¶ 11; Def. Ex. 20-5 at 23:18:15.  It is undisputed that during this time, several SDPD officers were hit with projectiles, including rocks and glass, thrown from the counter-protest crowd, and at least one officer received cuts to his hand due to a glass bottle being thrown at police.  DSS No. 23; Def. Ex. 6 at 3, 15; *see also* Def. Ex. 14; Def. Ex. 15; Def. Ex. 17.

In an effort to disperse the crowd, on several occasions the line of SDPD officers in the Buffer Zone moved north on Mission Boulevard, directing individuals to "move back" and physically pushing forward towards and into the counter-protesters.  Eglin Decl. ¶ 13; Richardson Decl. ¶ 10; Def. Ex. 18-2 at 23:32:14; Def. Ex. 19 at 23:32:39; Def. Ex. 20-9 at 23:32:15; Def. Ex. 20-10 at 23:32:23.  Rather than disperse, several counter-protesters stood firmly on the ground, sometimes with their arms interlocked.  Def. Ex. 18-2 at 23:32:14; Def. Ex. 19 at 23:32:40.  In one instance, Plaintiff Richardson was unable to move backward and, as a result, was shoved by a police officer with their baton, causing her to fall down and hit her head on the ground.  Richardson Decl. ¶ 11.

In another instance, an SDPD officer attempted to make an arrest, but several counter-protesters interfered by pulling the individual away from the SDPD officer.  Def. Ex. 18-2 at 23:32:56, 23:33:23; Novak Decl. ¶ 22.

At approximately 3:30 p.m., SWAT officers moved in front of the line of SDPD officers and fired pepper ball munitions onto the road, striking the ground several feet in front of the counter-protest crowd and dispersing the chemical contents into the air.  Eglin Decl. ¶ 14; Def. Ex. 18-2 at 23:33:40.

As a threshold matter, there is no evidence in the record that either Aguilar or Scott was involved in the dispersal of the counter-protesters.  That is, Plaintiffs do not argue or point to evidence showing that either Defendant was in the line of officers that physically moved north, pushing the counter-protesters back.  Further, the record reflects that SWAT officers deployed the pepper ball munitions, and there is no evidence that Aguilar or Scott were members of SDPD's SWAT team.  Plaintiffs offer no legal argument for why they, as Operations Lieutenants, should be held responsible for the use of force by others.  Consequently, as there is no argument or evidence tending to show that Aguilar or Scott either directly participated, or were sufficiently involved, in these events, the record does not support holding them liable for a violation of Plaintiffs' Fourth Amendment rights.[15]  *See Bonivert v. City of Clarkston*, 883 F.3d 865, 879 (9th Cir. 2018) (explaining that, pursuant to the integral participant doctrine, "[a]n officer can be held liable for a constitutional violation only when there is a showing of 'integral participation' or 'personal involvement' in the unlawful conduct, as opposed to mere

---

[15] The Court notes that even assuming Plaintiffs had put forth evidence that Aguilar and Scott were sufficiently involved in SDPD's dispersal efforts, the same analysis as to Novak applies to them and therefore the outcome is the same.  *See Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004) (holding that armed officers could be held liable for excessive force for providing backup to another officer's unconstitutional use of a flash-bang device because use of the device was "part of the search operation in which every officer participated in some meaningful way" and every officer "was aware of the decision . . . , did not object to it, and participated in the search operation knowing the flash-bang was to be deployed").

presence at the scene"); *see also Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019). For this reason, the Court finds that Defendants Aguilar and Scott are entitled to summary judgment on Plaintiffs' Fourth Amendment claim.

As to Novak, the Court assumes without deciding that he can be held liable for the use of force exerted as he was the Incident Commander during the protests and he ordered the unlawful assembly and, presumably, directed that SDPD (including SWAT) use force to dispel the crowd. In terms of the type and amount of force inflicted, the Ninth Circuit has "recognized that 'physical blows or cuts' often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (holding that the use of a progressive pain compliance device that inflicted temporary discomfort on the arrestees was not a substantial intrusion)). "The absence of concussive force is not determinative, however, and '[w]e have held that force can be unreasonable even without physical blows or injuries.'" *Nelson*, 685 F.3d at 878 (first quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010); then citing *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) (en banc) (pointing a weapon at unarmed child was unreasonable); and then citing *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc) (pointing a weapon at unarmed and nonthreatening individual was unreasonable)).

While there is some mention of SDPD's use of batons in Plaintiffs' pleading, *see* Compl. ¶¶ 11, 13–14, 79, 96, and Defendants' motion, Doc. No. 52-1 at 24–25, Plaintiffs do not argue in opposition to summary judgment that SDPD's use of batons amounted to excessive force. *See generally* Doc. No. 53 at 20–21. That said, Plaintiffs have put forth evidence that at least Richardson was physically touched by an SDPD officer and that she was impacted by an SDPD officer's baton. Richardson Decl. ¶ 11. It is important to note, however, that Richardson was neither struck nor hit with the baton. Based on her own characterization, she was "shoved" with a baton when officers were pushing the crowd back to disperse. *Id.* She continues that, because she could not move back due to

counter-protesters behind her, she fell down and another officer "picked me up by my backpack and tossed me on the other side of the police line (I am 4 foot 10 and petite)." *Id.*  While Richardson contends she hit her head on the ground, *see id.*, Plaintiffs do not aver or put forth any evidence that she suffered any injuries or needed medical treatment. Therefore on this record, the Court is highly doubtful that this use of force was anything other than minimal.  *See Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (noting that "[w]hile baton blows are a type of force capable of causing serious injury, jabs with a baton are less intrusive than overhand strikes") (internal citation omitted); *id.* ("We may infer from the minor nature of a plaintiff's injuries that the force applied was minimal.") (citing *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001)); *see also Jackson*, 268 F.3d at 651 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.") (quoting *Graham*, 490 U.S. at 396); *cf. Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (explaining that baton *blows* are regarded as intermediate force).

Defendants also defend the use of pepper ball munitions.  It is undisputed that the pepper ball munitions were aimed at the ground—not at any individuals—and that the projectiles ultimately hit the ground some feet in front of the counter-protesters.  There is no evidence that anyone, nonetheless any Plaintiff, was physically hit or otherwise injured by the pepper ball munitions, including the chemicals dispersed from the projectiles.[16]  Assuming Plaintiffs were even present when the pepper balls were deployed,[17] it is not clear that such an intrusion was greater than a minimal application of

---

[16] The Ninth Circuit has described "pepper balls" as "concentrated powdered chemical projectiles that induce a physical reaction similar to that caused by pepper spray." *Puente*, 123 F.4th at 1044.

[17] Plaintiffs have failed to submit evidence demonstrating that they were even present during the deployment of pepper ball munitions.  At best, Richardson contends that she was "present for all of the events depicted in the complaint" and, viewing the evidence in her favor, suggests that she was still in the area when the pepper ball munitions were deployed.  Richardson Decl. ¶¶ 6–9; *but see id.* ¶ 11 (explaining that after she was shoved to the ground, an officer moved her back to "the other side of the police line").  But neither Sernoffsky nor Gaw offer any evidence on this point.  Sernoffsky seems to admit in her declaration that she left the area of the protests prior to that time.  Sernoffsky Decl. ¶ 3

force.  The Court recognizes that "[l]ess than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible." *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (discussing the reasonableness of use of a beanbag projectile "akin to a rubber bullet"); *see Young*, 655 F.3d at 1161 (finding pepper spray is an intermediate force that presents a significant intrusion upon an individual's liberty interests); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1086 (N.D. Cal., 2020) (finding that chemical agents and flashbang grenades also constitute significant force).  But the Court "may also consider the severity of injuries in evaluating the amount of force used" and "may infer from the minor nature of a plaintiff's injuries that the force applied was minimal." *Felarca*, 891 F.3d at 817 (first citing *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002); and then citing *Jackson*, 268 F.3d at 652). Plaintiffs claim no injury, including from the chemical agents that were released from the munitions after they hit the ground.  In fact, Plaintiffs do not even argue that the use of pepper ball munitions here was a significant intrusion.[18]  So while this type of less than lethal force may be generally intrusive, here the record reflects that the amount of force actually applied was minimal.  *See Felarca*, 891 F.3d at 817 (concluding that the force used was minimal despite its generally intrusive nature, where no plaintiffs required medical treatment or missed the protest due to the defendants' blows).

---

(providing that "[w]hen the call was made to disperse," she walked her friend to the car and told SDPD officers she "would be walking home").  And Gaw has offered no declaration or other evidence at summary judgment pertaining to her presence at or involvement in the protests on January 9, 2021.  In fact, there is no evidence in the summary judgment record that Plaintiff Gaw was even present at the protests in Pacific Beach on January 9, 2021.

Because the record only reasonably supports the conclusion that Richardson was present during the deployment of pepper ball munitions, and Plaintiffs do not argue or contend otherwise, the Court only considers whether the use pepper ball munitions against Richardson was excessive.  Nevertheless, the Court notes that, to the extent Sernoffsky or Gaw were similarly present during these events, the same analysis applies.

[18] Plaintiffs' opposition is devoid of analysis or response to Defendants' excessive force arguments.  *See generally* Doc. No. 53.

Next, the Court must balance the intrusion against the government's interest. Richardson admits[19] she remained at the site of the unlawful assembly after she had been lawfully warned to disperse and therefore was actively violating the law.  Cal. Penal Code § 409.  Her crime, however, was not serious and "[p]rotesters' failure to immediately abide by dispersal orders do not automatically justify the use of less-lethal force."  *Berg v. Cnty. of L.A.*, No. CV 20-7870 DMG (PDx), 2021 U.S. Dist. LEXIS 195521, at *38 (C.D. Cal. May 28, 2021) (citing *Nelson*, 685 F.3d at 885 (holding that any reasonable officer should be on notice that "the application of pepper spray to individuals such as [plaintiff] and his associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment")). "But the government interest in using force is stronger where protesters 'understood police had ordered them to disperse, ignored or dismissed those orders, and instead directly interfered with officers' attempt to enforce [the law].'"  *Id.* (first quoting *Felarca*, 891 F.3d at 818; and then citing *Forrester*, 25 F.3d at 806).

Here, similar to the facts in *Jackson*, the counter-protesters "refused to obey the officers' commands to disperse," "shouted at the officers," and "engaged the officers in verbal and physical altercations."  *See* 268 F.3d at 652–53.  The counter-protesters also ignored warnings by police that chemical agents would be used before SWAT deployed the pepper ball munitions.  *Id.*  Similar to *Jackson*, it is undisputed that Richardson in particular understood SDPD had ordered her to disperse and that she ignored those orders and instead directly interfered with officers' attempt to maintain order by, at least, remaining in the area of the unlawful assembly.  *See id.* at 653.  Richardson's and the counter-protesters' "active interference posed an immediate threat to the officers' personal safety and ability to control the group."  *Id.*

---

[19] *See supra* footnote 17.  To the extent any Plaintiff denies that they remained at the site of the unlawful assembly, they could not have been present during the pepper ball shooting and therefore cannot press a Fourth Amendment claim on this basis.

Importantly, Defendants' use of force expert opines that, under these circumstances, it was objectively reasonable to deploy pepper ball munitions. As discussed above, the counter-protesters failed to disperse after at least two separate unlawful assembly announcements and instead, "became increasingly violent." Eglin Decl. ¶ 29. There is no evidence that SWAT deployed the pepper ball munitions "indiscriminately or at individuals that were not posing a threat." *Nelson*, 685 F.3d at 878–79. To the contrary, as noted, it is undisputed that the pepper ball munitions were deployed at the ground, several feet away from the counter-protesters. Eglin Decl. ¶¶ 14, 30; Def. Ex. 18-2 at 23:33:41. In Eglin's opinion, "the use of Pepperball munitions as a force multiplier, in this case, brought an increasingly violent situation to a rapid end, ensuring the safety of the individuals in the crowd and the law enforcement personnel." Eglin Decl. ¶ 31. He also testified that the use of pepper ball munitions here "was consistent with general law enforcement training, practices, and procedures in California and was consistent with the training, policies, and procedures of the San Diego Police Department." Eglin Decl. ¶ 32.

Plaintiffs offer no evidence to the contrary. They do not genuinely argue the use of batons or pepper ball munitions here was excessive or unreasonable under the circumstances. *See* Doc. No. 53 at 20–21. Nor do they put forth evidence sufficient for a reasonable jury to find that it was. The undisputed evidence reflects that the counter-protest group was lawfully warned to disperse at least twice. Richardson admittedly ignored these warnings. Even viewing the evidence in Plaintiffs' favor, while they personally may not have committed any acts of violence or thrown any objects at police, Richardson nevertheless remained present at the unlawful assembly location among individuals who had exhibited violence and were actively throwing items at and interfering with police, and within a crowd that was growing increasingly violent and noncompliant. Counter-protesters interfered with SDPD's attempts to arrest individuals, and SDPD's attempts to force the counter-protesters to disperse by pushing the crowd back were unsuccessful. As Eglin opines, the use of pepper ball munitions was, under

these circumstances, consistent with the general practice in California.  Plaintiffs put forth no evidence or argument tending to show otherwise, nor do they explain what other less intrusive means of dispersal were available.

Therefore, as was the outcome in *Jackson*, the Court finds that physical pushes, including with batons, and the use of less-lethal munitions here were the least intrusive means to disperse a violent and unlawful crowd and protect the safety of the officers and bystanders.  Consequently, because Plaintiffs have failed to raise a triable issue of fact as to the reasonableness of the force used, as well as Novak's decision to order SWAT to use pepper ball munitions to disperse the unlawful assembly counter-protest crowd, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' Fourth Amendment claim.

### 3.    *Qualified Immunity*

Even assuming Plaintiffs had raised a triable issue as to whether the use of force here was objectively unreasonable, the Court finds that Defendants are entitled to qualified immunity as to Plaintiffs' Fourth Amendment claim.  "To determine whether an officer is entitled to qualified immunity, the Court asks, in the order it chooses, (1) whether the alleged misconduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct."  *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (alterations and quotation marks omitted)).  "While the constitutional violation prong concerns the reasonableness of the officer's *mistake of fact*, the clearly established prong concerns the reasonableness of the officer's *mistake of law*."  *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011)) (quotation marks omitted) (emphases in original).  If the answer to either question is no, then the officer cannot be held liable for damages.  *Id.* (citation omitted).

"The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."  *District of*

*Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  "[T]he clearly established right must be defined with specificity," and not at "a high level of generality."  *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (citations and quotation marks omitted).  "It is not necessary . . . that the very action in question has previously been held unlawful. . . . But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent."  *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (citations and quotation marks omitted).  "When this test is properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hernandez*, 897 F.3d at 1132–33 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Here, Plaintiffs have pointed to no law demonstrating that the right at issue was clearly established at the time of the January 2021 protests.  *See* Doc. No. 53 at 22. Instead, they argue that Defendants bear the burden of proving qualified immunity as an affirmative defense.  *Id.*  But "[t]he plaintiff 'bears the burden of showing that the rights allegedly violated were clearly established[]'" at the time of challenged conduct.  *Gordon II*, 6 F.4th at 969 (quoting *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).  Plaintiffs also contend that "there is a dispute of material fact regarding whether anything at all was happening at the time and location Defendants declared an 'unlawful assembly' as to only the anti-Trump side at Hornblend and Mission at 2:34 p.m."  Doc. No. 53 at 22.  Therefore, according to Plaintiffs, "Defendants are clearly not entitled to qualified immunity for declaring an 'unlawful assembly' to exist where the criminal elements are simply not present."  *Id.*  This argument misses the mark.  In any event, Plaintiffs fail to correctly identify the right at issue here with the necessary specificity.

Prior to the January 9, 2021 protests, it was clearly established that an individual has a right to be free from excessive force and that "force is only justified when there is a need for force."  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007).

However, "[p]laintiffs asserting excessive force claims must . . . point to an existing rule that 'squarely governs' the facts at issue and that moves the officer's actions outside the 'hazy border between excessive and acceptable force.'" *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004); and then citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam) (explaining that the burden is on the plaintiff to identify precedent "that put [the defendant] on notice that his specific conduct was unlawful")).  The Supreme Court has cautioned that the "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).  This is in part because "[i]n performing the qualified immunity analysis, we do not 'second-guess officers' real-time decisions from the standpoint of perfect hindsight.'" *Hopson*, 71 F.4th at 700 (quoting *O'Doan*, 991 F.3d at 1036).

To defeat Defendants' claim of qualified immunity here, Plaintiffs therefore must demonstrate that based upon the state of the law available at the time of the protests, the reasonable official knowing what Defendants knew would have understood that the pushing individuals using batons and deploying pepper ball munitions at the ground in an effort to disperse an unlawful assembly crowd constituted excessive force in violation the Fourth Amendment.  Here, neither the parties' briefing nor the Court's independent research has revealed any case "that articulates a constitutional rule specific enough to alert *these* [officers] in *this case* that *their particular conduct* was unlawful." *Spencer v. Pew*, 117 F.4th 1130, 1138 (2024) (emphasis in original).  It was not clearly established law that an individual has a right to be free from a baton push when they remain present at the site of an unlawful assembly after being warned to disperse more than once. *See Felarca*, 891 F.3d at 822 (finding no violation of clearly established law where, "after several warnings to disperse have been given, the officer uses baton strikes on a plaintiff's torso or extremities for the purpose of moving a crowd actively obstructing the

officer from carrying out lawful orders in a challenging environment").  And the Court is unable to find a single Ninth Circuit case analyzing the deployment of less-lethal projectiles, such as pepper ball munitions, at the ground—let alone one holding that such a use of force is excessive in the context of dispersing from the site of an unlawful assembly a noncompliant crowd of individuals who had been violent and posed a continuing threat of violence, and had ignored all dispersal orders and use of force warnings.  All of the cases in this space involve individuals who were ultimately shot with the projectiles, which Plaintiffs were not.

The Court finds that *Nelson* is distinguishable and that such a distinction is instructive here.  In *Nelson*, the Ninth Circuit considered an excessive force claim where police fired pepper balls at a crowd of college-aged partygoers who were trespassing. *See Nelson*, 685 F.3d at 872–73.  Although there were some individuals who had thrown bottles at the officers, it was undisputed that the *Nelson* plaintiff was not among that group of individuals.  *Id.* at 883.  Nevertheless, officers shot at the *Nelson* plaintiff while he was attempting to leave, and he was hit by a projectile.  *Id.* at 882–83.  The Ninth Circuit concluded that this use of force was not "justified by the government's interest in stopping any and all disorderly behavior," particularly when the partygoers could have been "dispersed by less forceful means."  *Id.* at 883.

Here, Richardson was among the crowd of individuals that were throwing items such as glass bottles at police and interfering with officers' efforts to make arrests. Richardson was not attempting to leave but admits she remained in the area to continue protesting.  Officers did not aim the pepper ball munitions at Richardson or the crowd, but rather aimed and fired them at the ground.  And Richardson was not struck by any projectiles.  Unlike in *Nelson*, then, it cannot be said on these facts that Richardson had a clearly established right to be free from having pepper balls shot at the ground, feet away from her.

Plaintiffs have identified no such case addressing these or sufficiently similar facts and holding that the use of batons to push a crowd, and firing pepper ball munitions at the

ground, violates an individual's Fourth Amendment rights under similar circumstances. As there is no existing precedent that squarely governs these facts and holds that they are insufficient to justify the use of minimal force and less-than lethal munitions, especially where those munitions were properly deployed at the ground, feet away from individuals, the Court finds that Defendants are entitled to qualified immunity. On this alternative ground, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' Fourth Amendment claim.

## C.    Fourteenth Amendment

Finally, Plaintiffs contend that Defendants violated their Fourteenth Amendment substantive due process right to remain in a place of their choosing. Compl. ¶ 98. Defendants argue that Plaintiffs claims are more appropriately analyzed under the Fourth Amendment. Doc. No. 52-1 at 26. The Court agrees. Plaintiffs' arguments in opposition are inapposite. *See* Doc. No. 53 at 21–22. First, they argue that "[i]n the context of a loitering ordinance, the Supreme Court has held that the Due Process clause of the Fourteenth Amendment protects an individual's right to remain in a place of one's choosing." *Id.* at 21. But the present case does not involve a loitering ordinance, nor does it involve the "freedom to loiter for innocent purposes," which the Supreme Court recognized as "part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999). This case involves Plaintiffs' asserted rights to be free from unreasonable seizures as well as government interference with their right to peacefully assemble. More specifically, the facts of this case center around a protest that was ultimately determined by police to be an unlawful assembly and the subsequent dispersal efforts by police.

These facts and asserted violations of rights implicate the First and Fourth Amendments. And "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (cleaned

up); *see also J.T. v. City & Cnty. of S.F.*, No. 23-cv-06524-LJC, 2024 U.S. Dist. LEXIS 105472, at *40 (N.D. Cal. June 13, 2024) (dismissing Fourteenth Amendment substantive due process claim based upon an allegedly unlawful arrest "as redundant" and not supported by law "because all claims for unreasonable search and seizure must be analyzed under the Fourth Amendment") (internal quotation marks and citation omitted).

Addressing this point, Plaintiffs curiously argue that "this ignores the equal protection argument and differential treatment of the [protest] side as well as other bystanders, as Plaintiffs are not alleged to have engaged in any of the actions themselves that Defendants contend made some subset of the people present guilty of engaging in an 'unlawful assembly.'"  Doc. No. 53 at 21–22.  It is not clear to what "equal protection argument" Plaintiffs are referring.  There is no equal protection claim in their pleading.  To be sure, Plaintiffs' Complaint is devoid of any mention of equal protection.  Instead, Plaintiffs expressly plead that they press their claim based upon a violation of their "Fourteenth Amendment right to due process and to remain in a place of their choosing."  Compl. ¶ 98.

For the reasons discussed above, Plaintiffs did not have a right "to remain in a place of their choosing" when that place is the site of an unlawful assembly.  Moreover, Plaintiffs do not explain to what protected class they belong.  *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) ("To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class.").  Nor do Plaintiffs plead, explain, or put forth evidence or argument tending to show that they are a "class of one," *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), and were intentionally treated differently than others, with whom they are similarly situated "in all material respects," *SmileDirectClub, Ltd. Liab. Co. v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022) ("We join our sister circuits in holding that a class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects.").  There is no evidence Plaintiffs were singled out.  Additionally, Plaintiffs have made no effort to identify a

similar comparator.  Presumably, Plaintiffs base this hypothetical equal protection claim on their position that they, and the counter-protest group generally, were treated differently than the protesters.  But the threshold inquiry is whether Plaintiffs and the comparator—the protesters—were similarly situated.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Thus, Plaintiffs would at a minimum need to put forth evidence demonstrating either that both groups were violent and/or posed an immediate threat of violence, or that both groups were peaceful and posed no threat of violence.  They have not done so.

Consequently, the Court finds that Plaintiffs' Fourteenth Amendment substantive due process claim is duplicative of their other claims and that an independent claim is not supported by the undisputed facts or law on this record.  As such, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' Fourteenth Amendment claim.

**D.    Conspiracy Allegations**

Finally, Defendants seek summary judgment as to Plaintiffs' conspiracy claim. Doc. No. 52-1 at 27.  So far as the Court can tell, there is no such conspiracy claim. Instead, in one instance, Plaintiffs allege that "Defendants each conspired to violate and did violate and/or ratify the violation of the First, Fourth, and Fourteenth Amendment rights of Plaintiffs . . . ."  Compl. ¶ 95.  According to Defendants, this allegation is unsupported by the evidence.  Doc. No. 52-1 at 27.  Plaintiffs do not respond to this argument.  *See* Doc. No. 53.

As an initial matter, all three Defendants are state actors who were present at and actively participated in the events in question.  So it is not entirely clear if conspiracy liability is relevant or applicable here.  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) ("Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired. Conspiracy in § 1983 actions is usually alleged by plaintiffs to

draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action doctrine, or to aid in proving claims against otherwise tenuously connected parties in a complex case.") (internal citations omitted). Regardless, the Court agrees that Plaintiffs have put forth no evidence that Defendants formed an express or implied agreement, or meeting of the minds, to deprive Plaintiffs of their constitutional rights, as is required to establish conspiracy liability under section 1983. *Id.*; *see also Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) ("To prove a conspiracy between the police and Franklin-Lipsker under § 1983, Franklin must show an agreement or meeting of the minds to violate constitutional rights.") (internal quotation marks and citation omitted).

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment to the extent Plaintiffs press their claims against Defendants based upon a theory of conspiracy liability.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment in its entirety. The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendants on all of Plaintiffs' claims.

**IT IS SO ORDERED**.

Dated: March 26, 2025

HON. MICHAEL M. ANELLO
United States District Judge